# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| BUTTERMILK SKY OF TN LLC and BUTTERMILK SKY FRANCHISING, INC., <br>     *Plaintiffs*, <br><br> v. <br><br> BAKE MOORE, LLC, ONE MOORE TIME, LLC, CLARK BAKERY FRISCO LLC, AGAPE PIES LLC, CRAIG MOORE, DONNIE ROBERTSON, LEAH CLARK, and RACHEL DYMOND, <br>     *Defendants*. | Civil Action No. 4:20-CV-00327 <br> Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs BUTTERMILK SKY OF TN LLC and BUTTERMILK SKY FRANCHISING, INC.'s (collectively, "Plaintiffs") Motion for Preliminary Injunction (Dkt. #4). Having considered the motion, the relevant pleadings, and the evidence presented at the July 29 hearing, the Court finds that Plaintiffs' motion should be denied.

### BACKGROUND

**Factual Background**

In October of 2013, Scott and Meredith Layton formed Buttermilk Sky of TN LLC ("BSTN") and opened the first Buttermilk Sky Pie Shop (Dkt. #4). In opening the first Buttermilk Sky Pie Shop, BSTN created the mark BUTTERMILK SKY PIE SHOP EST. 2013 (& design)®:



(Dkt #4). BSTN owns all right, title, and interest in and to the mark, including but not limited to U.S. Registration No. 4,894,658 for use in International Class 35 for "Online retail bakery shops; Retail bakery shops" (Dkt. #4). BSTN also created and owns all the right, title, and interest in and to several unregistered marks:

1. BUTTERMILK SKY PIE SHOP™
2. BUTTERMILK SKY PIE SHOP (& design)™:



3. BUTTERMILK SKY™
4. I-40™
5. SHARE PIE. SHARE LOVE.™

(Dkt. #4). Together, BSTN's registered and unregistered trademarks are the "Buttermilk Trademarks." The Buttermilk Sky Pie Shops have also developed a trade dress ("Buttermilk Trade Dress") that is used in Buttermilk Sky Pie Shops (Dkt. #4).

Within a year of opening the first Buttermilk Sky Pie Shop, the Laytons formed Buttermilk Sky Franchising, Inc. ("BSFI") to manage the franchising of Buttermilk Sky Pie Shops (Dkt. #4). BSTN has authorized BSFI to license the Buttermilk Trademarks and Buttermilk Trade Dress (Dkt. #4). When BSFI authorizes the opening of a new shop, the shop owners become privy to confidential information, copyrights, trade secrets, recipes, and proprietary information (Dkt. #4).

In 2016, Craig Moore ("Moore") reached out to Plaintiffs in hopes of opening Buttermilk Sky Pie Shops in Frisco and Allen Texas (Dkt. #4; Dkt. #35). Eventually, discussions of opening two new shops shifted to discussions of Moore joining BSFI's executive team (Dkt. #4; Dkt. #35). In 2017, after beginning preparations for opening his two Buttermilk Sky Pie Shops, Moore officially joined BSFI as CEO, a member of the Board, and a preferred shareholder (Dkt. #4; Dkt. #35).

In order to open his two new shops in Texas, Moore formed Bake Moore, operator of the Allen location, and One Moore Time, operator of the Frisco location (Dkt. #4; Dkt. #35). Neither Moore nor the business entities formed by him signed a franchise or license agreement (Dkt. #4; Dkt. #35). Instead, there was a spoken agreement between the parties. Plaintiffs claim in lieu of signing any agreement, Moore was required to follow the rules that BSFI required all franchisees to follow as part of an oral agreement (Dkt. #4; Dkt. #35). Moore contends that there was no signed franchise or license agreement because Moore's shops were to operate as "affiliate" stores, similar to the way the original Buttermilk Sky Pie Shop operated (Dkt. #4; Dkt. #35).

In the fall of 2017, Moore hired Donnie Robertson ("Robertson") as Chief Marketing Officer ("CMO") for BSFI (Dkt. #4; Dkt. #35). In July of 2018, Moore sold all interest in Bake Moore to Robertson (Dkt. #4; Dkt. #35). Neither Robertson nor the business entity owned by him signed a franchise or license agreement to operate the Frisco location of Buttermilk Sky Pie Shop (Dkt. #4; Dkt. #35).

In 2019, the relationship between Plaintiffs and Moore and Robertson soured (Dkt. #4; Dkt. #35). Moore and Robertson allege their relationship with Plaintiffs soured because the Laytons misused company money (Dkt. #35); Plaintiffs allege the relationship soured because Moore and Robertson violated franchise rules and employment agreements (Dkt. #4). Plaintiffs subsequently ended Moore and Robertson's employment with Buttermilk Sky (Dkt. #4; Dkt. #35).

After Plaintiffs ended Moore and Robertson's employment with Buttermilk Sky, BSFI sent several letters to Moore's attorney requesting: (1) a special meeting; and (2) that Moore and Robertson cease and desist their use of the Buttermilk Trademarks and Buttermilk Trade Dress (Dkt. #4; Dkt. #35). After several more months of Moore and Robertson both declining to sign a franchising agreement, Plaintiffs revoked the license granted to Bake Moore and One Moore Time

(Dkt. #4; Dkt. #35). Still, Moore and Robertson continued to operate as a Buttermilk Sky Pie Shop—at least for a time (Dkt. #35). Plaintiffs filed this lawsuit after having allegedly revoked Moore and Robertson's licenses (Dkt. #4).

Defendants contend that since Plaintiffs filed suit, Defendants sold the stores to Rachel Dymond and Leah Clark. Further, Defendants allege both stores have rebranded and now operate as different bakeries—Agape Pies and Batch Bakery—and so Defendants are no longer infringing on any Buttermilk Trademarks or Buttermilk Trade Dress (Dkt. #35).

**Procedural Background**

Plaintiffs filed this suit on April 17, 2020 (Dkt. #1). The same day, Plaintiffs filed their Motion for Preliminary Injunction (Dkt. #4). On June 16, 2020, Defendants filed their response (Dkt. #35). Plaintiffs filed a reply on June 22, 2020 (Dkt. #39).

In Defendants' response, Defendants requested a hearing on the matter (Dkt. #35). The Court granted the request for a hearing on July 7, 2020, and the Court heard the parties' arguments regarding Plaintiffs' Motion for Preliminary Injunction on July 29, 2020.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc*., 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id*. Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp.*

4

*v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

### I. Plaintiffs Are Not Entitled to a Preliminary Injunction

Plaintiffs argue that Defendants[1] have infringed on Buttermilk Trademarks and Buttermilk Trade Dress in violation of the Lanham Act and that Defendants have misappropriated Plaintiffs' trade secrets in violation of the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act. As such, Plaintiffs avow they are entitled to injunctive relief. The Court is unpersuaded.

Plaintiffs failed to present evidence—both in their motion and during the July 29 hearing—that would allow the Court to find that Plaintiffs have "clearly carried" their burden on any of the four preliminary-injunction elements. Plaintiffs are thus not entitled to the extraordinary remedy of a preliminary injunction.

#### A. Likelihood of Success

Plaintiffs claim that they are likely to succeed on the merits of their trademark infringement, trade dress infringement, and trade secret misappropriation claims. While the Court agrees that Plaintiffs are likely to show that they own legally protectable trademarks and that Buttermilk Trade Dress is protected, Plaintiffs have not presented evidence at this stage showing that they are likely to succeed in establishing that Defendants' conduct has resulted in a likelihood of confusion. Nor have Plaintiffs provided evidence showing that they are likely to succeed on their trade secret misappropriation claims. Accordingly, Plaintiffs have not shown that this factor weighs in favor of preliminary-injunctive relief.

---

[1] Plaintiffs ask for the Court to enjoin "Defendants" (Dkt. #4)—yet, Plaintiffs focus their arguments and evidence only on Batch Bakery.

### i. Plaintiffs' Trademark and Trade Dress Infringement Claims

Plaintiffs have not shown that they are likely to succeed on the merits of their trademark and trade dress infringement claims. "The Lanham Act establishes liability against '[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .'" *Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-CV-00227, 2020 WL 4016110, at *9 (E.D. Tex. July 16, 2020) (quoting 15 U.S.C. § 1125(a)(1)(A)). Specifically, for trademark and trade dress infringement claims, the Lanham Act requires a plaintiff to show: (1) that it owns a legally protectable trademark; and (2) that a defendant's use of their mark creates a likelihood of confusion as to source, affiliation, or sponsorship. *See Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 483 (E.D. Tex. 2020); *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989).

Plaintiffs contend they "will readily satisfy both elements" of their infringement claims and succeed on the merits. But Plaintiffs did not put evidence before the Court that would allow the Court to be so convinced. Plaintiffs *have* provided evidence to establish the first element; but Plaintiffs fall woefully short in establishing the second.

As to the first element, Plaintiffs argue that they are the owners of Buttermilk Trademarks and Buttermilk Trade Dress and that those marks are legally protected. Defendants do not dispute that. But as to the second element, Plaintiffs failed to carry their burden at this stage, providing little to no evidence that would allow the Court to conclude that Plaintiffs are likely to succeed in showing that there is a likelihood of confusion.

### 1. Plaintiffs Will Likely Succeed in Showing That Buttermilk Trademarks Are Protectable

"A plaintiff must establish both that the mark is 'eligible for protection' and that the plaintiff is the 'senior user' of the mark to have a legally protectable interest in the mark." *Fletcher's*, 434 F. Supp. 3d at 483. Plaintiffs will likely succeed in making that showing at trial.

In determining the protectability of a mark, courts must determine whether the mark is registered—registered marks are afforded the presumption of validity. 15 U.S.C. § 1115 ("Any registration . . . of a mark . . . shall be prima facie evidence of the of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark . . . ."). Unregistered marks, however, are not afforded this presumption. *Fletcher's*, 434 F. Supp. 3d at 483.

The key in determining whether an unregistered mark is eligible for protection is "whether the mark is 'capable of distinguishing the applicant's goods from those of others.'" *Id.* (internal citations omitted). An unregistered mark can be distinct in one of two ways: (1) it can be inherently distinctive; or (2) even if not inherently distinctive, it can acquire distinctiveness by developing secondary meaning. *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 190 (5th Cir. 2018).

A mark is considered "inherently distinctive if its intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000). Courts use a five-category spectrum to assess the distinctiveness of a word mark—a word mark can be: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 (5th Cir. 2015). "While suggestive, arbitrary, and fanciful marks are inherently distinctive, generic marks cannot be distinctive, and descriptive marks are distinctive only if they have acquired 'secondary meaning.'" *Id.*

Plaintiffs argue that each of the Buttermilk Trademarks are legally protected. Of the Buttermilk trademarks, only the BUTTERMILK SKY PIE SHOP EST. 2013 (design)® is registered—affording the mark the presumption of validity. 15 U.S.C. § 1115(a).[2] Plaintiffs' other marks though, are unregistered and must satisfy one of the two categories of distinctiveness. Plaintiffs contend each of the unregistered marks are inherently distinctive:

> (1) BUTTERMILK SKY™, BUTTERMILK SKY PIE SHOP™ and BUTTERMILK SKY PIE SHOP (&design) are arbitrary: "buttermilk sky" is a colloquialism that refers to a cloudy sky resembling the mottled or clabbered appearance of buttermilk—not something that describes or even suggests pie; (2) I-40™ is arbitrary: it refers to an interstate highway, not to a pie; (3) SHARE PIE. SHARE LOVE.™ is suggestive: it suggests a connection between love and pie.

(Dkt. #4). The Court finds that Plaintiffs will likely be able to prove that their unregistered marks are either arbitrary or suggestive and therefore afforded protection as inherently distinctive marks.

"Arbitrary" word marks are marks that neither describe nor suggest something about the goods or services they represent. J. THOMAS MCCARTHY, 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:11 (5th ed.). For example, the mark APPLE for computers and other electronic goods is arbitrary. The word "apple" is commonplace and it neither describes nor suggests anything about computers or electronic goods. *Id.* Here, the term "buttermilk sky" is arbitrary. "Buttermilk sky" is a commonplace description of the sky when it is cloudy. But the words "buttermilk sky" neither describe nor suggest anything to do with pies. Following the same logic, "I-40" is also arbitrary. I-40 is the name of a highway but, like buttermilk sky, it neither describes nor suggests anything to do with pies. For these reasons, the Court agrees with Plaintiffs that they will likely be able to prove that the "Buttermilk Sky" and "I-40" trademarks are arbitrary.

A "suggestive" word mark is a mark that is borderline between the arbitrary and descriptive categories. MCCARTHY § 11:63 (5th ed.). "A suggestive mark 'suggests, but does not describe,

---

[2] Defendants do not offer evidence to rebut this presumption.

8

an attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good.'" *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 814 (5th Cir. 2019). Here, "SHARE PIE. SHARE LOVE.™" is suggesting that sharing a pie is the same thing as sharing love with someone. This mark requires a consumer to exercise his imagination to equate a pie with love. *See id.* at 815. The Court agrees that Plaintiffs will likely be able to show that this trademark is suggesting an attribute, rather than describing it.

As stated above, a registered mark is presumed valid, but an unregistered mark must be either inherently distinct or have acquired distinctiveness. And any unregistered mark that is determined to be arbitrary or suggestive is inherently distinctive. Plaintiffs have shown that they will likely be able to succeed in showing that each of the unregistered Buttermilk Trademarks are arbitrary or suggestive. Therefore, Plaintiffs have shown that they will likely succeed in showing that all Buttermilk Trademarks—registered and unregistered—are eligible for protection.

Having shown that Buttermilk Trademarks are likely eligible for protection, the Court will now determine if Plaintiffs are likely to succeed in showing that they are the senior user of Buttermilk Trademarks. "The first one to use a mark is generally held to be the 'senior' user." *Fletcher's*, 434 F. Supp. 3d at 486 (internal citations omitted). Plaintiffs have used the Buttermilk Trademarks since first creating Buttermilk Sky Pie Shop in 2013. Plaintiffs have established, and Defendants do not dispute, that Plaintiffs own all rights, title, and interest in and to the Buttermilk Trademarks. As such, Plaintiffs are likely to succeed in showing that they are the senior user of the Buttermilk Trademarks.

Plaintiffs will likely successfully establish that Plaintiffs have an interest in legally protectable marks and that Plaintiffs are the senior users of those marks. Accordingly, Plaintiffs are likely to succeed at trial on the first element of their trademark infringement claim.

### 2. Plaintiffs Will Likely Succeed in Showing That Buttermilk Trade Dress Is Protectable

As to their trade dress claim, Plaintiffs are likely to succeed in proving that Buttermilk Trade Dress is protected. Trade dress "refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Test Masters Educ. Servs., Inc. v. State Farm Lloyds*, 791 F.3d 561 (5th Cir. 2015) (quoting *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010)). Trade dress has been expanded to also include the overall "motif" of a restaurant. *Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, No. 4:19-CV-00067, 2019 WL 1560442, at *4 (E.D. Tex. Apr. 10, 2019). To gain protection, trade dress must be: (1) distinctive or have acquired a secondary meaning; and (2) be nonfunctional. *Id.* Plaintiffs are likely to succeed in showing both elements.

As with trademarks, trade dress is inherently distinctive if its intrinsic nature serves to identify its particular source. *Id.* But "[t]he law relating to whether a trademark is inherently distinctive is more developed for word marks than for trade dress"—leaving courts without a settled test for when trade dress achieves inherently distinct status. *AMID, Inc. v. Medic Alert Found. U.S., Inc.*, 241 F. Supp. 3d 788, 802 (S.D. Tex. 2017) (Rosenthal, C.J.) (citation omitted). Nonetheless, caselaw is instructive.

*Sparrow Barns* and *Two Pesos* provide guidance on how courts should handle issues of inherent distinction for trade dress. In *Sparrow Barns*, this Court followed *Two Pesos*'s lead and looked towards the actual description of the parties' trade dress; Sparrow Barns described its trade dress for the "White Sparrow" as such:

> The Grand Hall features a large, open floor plan with exposed, decorative, wrapped and framed, vaulted wooden beams placed laterally across the wooden cathedral ceiling; exposed, decorative, wrapped and framed wooden columns placed vertically along the wooden side walls; tiered exposed bulb candelabra chandeliers;

10

> rustic whitewashing of the wooden interior features; and a stylistic, stacked window display along the back wall.

*Sparrow Barns*, 2019 WL 1560442, at *4. And in *Two Pesos*, Taco Cabana described its trade dress as:

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

*Sparrow Barns*, 2019 WL 1560442, at *4 (quoting *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120 (5th Cir. 1991), *aff'd sub nom*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992)). This Court in *Sparrow Barns* found that, like Taco Cabana, Sparrow Barns could "likely show the trade dress of the Grand Hall [was] inherently distinctive because its intrinsic nature serves to identify its source as the White Sparrow." *Id*.

Buttermilk Trade Dress is similarly descriptive. Plaintiffs describe the trade dress of Buttermilk Sky Pie Shops as:

> The BUTTERMILK SKY PIE SHOP™ bakeries employ a distinctive trade dress that allows customers to experience the nostalgic taste of pie made fresh in a traditional Southern kitchen. Each element invokes the experience of rustic Southern charm, including shelving space for a wide variety of gift products and signs .... The BUTTERMILK SKY PIE SHOP™ bakeries' distinctive trade dress includes the following elements: a. A sliding barn door with a glass panel to separate the sales counter from the kitchen; b. A full wall of white subway tile behind the sales counter; c. A bleached or whitewashed wood (or wood-look) tongue-and-groove ceiling with contrasting darker wood (or wood-look) beams; d. Turned wood "supports" under the countertops; e. Distinctive pie stands that have turned wood bases and galvanized and/or riveted metal trim around the plate; and f. A repeating star motif in exterior signage.

(Dkt. #4). Like the trade dress descriptions in *Sparrow Barns* and *Two Pesos*, Plaintiffs' description of Buttermilk Trade Dress could show that the trade dress is inherently distinctive because its intrinsic nature serves to identify its source as a Buttermilk Sky Pie Shop.[3]

Having found Buttermilk Trade Dress to be inherently distinct, the Court now addresses whether Buttermilk Trade Dress is nonfunctional. The Court finds that Plaintiffs are likely to succeed in showing that it is nonfunctional.

Courts use "two tests to determine whether a product feature is functional—the traditional and competitive necessity tests." *Sparrow Barns*, 2019 WL 1560442, at *6. "The traditional test of functionality is whether the product feature 'is essential to the use or purpose of the article or if it affects the cost or quality of an article.'" *AMID*, 241 F. Supp. 3d at 819. If a feature serves any significant function other than to distinguish a firm's goods or identify their source, then it is considered to be "essential" to the use or purpose of a product. *Id.* Simply put, if the product feature "is the reason the device works, then the feature is functional." *Id*. (internal citations omitted).

"Under the competitive necessity test, a feature is functional 'if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.'" *Sparrow Barns*, 2019 WL 1560442, at *6 (quoting *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH,* 289 F.3d 351, 356 (5th Cir. 2002)). "Even if individual constituent parts of a product's trade dress are functional, 'a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'" *Id.* (quoting *Ritter*, 289 F.3d at 356). So, the

---

[3] Plaintiffs have failed to provide evidence that Buttermilk Trade Dress has acquired secondary meaning. But this is not fatal to their assertion that Buttermilk Trade Dress is protected. *See Two Pesos*, 505 U.S. at 776 ("[P]roof of secondary meaning is not required to prevail on a claim . . . where the trade dress at issue is inherently distinctive."). Accordingly, Plaintiffs satisfying the requirement that they are likely to show Buttermilk Trade Dress is inherently distinct is sufficient for this element.

question is not whether some piece of the trade dress is functional, but whether the trade dress as a whole is functional. *Id.* (citing *Two Pesos*, 92 F.2d at 1119).

Plaintiffs have shown that they are likely to succeed in establishing Buttermilk Trade Dress as nonfunctional. Again, Plaintiffs describe the trade dress of Buttermilk Sky Pie Shops as:

> The BUTTERMILK SKY PIE SHOP™ bakeries employ a distinctive trade dress that allows customers to experience the nostalgic taste of pie made fresh in a traditional Southern kitchen. Each element invokes the experience of rustic Southern charm, including shelving space for a wide variety of gift products and signs . . . . The BUTTERMILK SKY PIE SHOP™ bakeries' distinctive trade dress includes the following elements: a. A sliding barn door with a glass panel to separate the sales counter from the kitchen; b. A full wall of white subway tile behind the sales counter; c. A bleached or whitewashed wood (or wood-look) tongue-and-groove ceiling with contrasting darker wood (or wood-look) beams; d. Turned wood "supports" under the countertops; e. Distinctive pie stands that have turned wood bases and galvanized and/or riveted metal trim around the plate; and f. A repeating star motif in exterior signage.

(Dkt. #4). A bakery could operate with different tiles on the wall, no barn door, different pie stands, different colored wood, or no wood at all. Indeed, a bakery could operate without *any* of the features denoted by Plaintiffs as part of the Buttermilk Trade Dress. And even if the argument could be made that certain features of the trade dress are functional, the trade dress as a whole is not. At its core, Buttermilk Trade Dress is meant to identify a distinct venue—Buttermilk Sky Pie Shops. Thus, Plaintiffs will likely show Buttermilk Trade Dress is nonfunctional.

Given that Plaintiffs will likely establish Buttermilk Trade Dress is: (1) inherently distinct; and (2) nonfunctional as a whole, Plaintiffs can likely establish Buttermilk Trade Dress is protectable—the first element of their trade dress infringement claim.

### 3. Plaintiffs Have Not Provided Evidence on Likelihood of Confusion

The second element of Plaintiffs' trademark and trade dress infringement claims requires analysis of whether a defendant's actions have caused a likelihood of confusion about the plaintiff's mark. The Fifth Circuit has identified a non-exhaustive "digits of confusion" to guide

courts in determining whether use of a mark has created a likelihood of confusion. *Springboard*, 912 F.3d at 812. These digits include:

> (1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.

*Id.* "These digits are flexible," serving only as guides for how the Court should evaluate whether there is a likelihood of confusion. *Id.* Accordingly, courts should "keep in mind two important principles while applying these digits: (1) '[they] must consider the application of each digit in light of the specific circumstances of the case'; and (2) '[they] must consider the marks in the context that a customer perceives them in the marketplace.'" *Id.* (internal citations omitted).

Here, Plaintiffs contend that Defendants are mixing Buttermilk Trademarks with Defendants' own products. The combination of these two acts, Plaintiffs continue, is causing confusion. But the evidence of any confusion is lacking right now. In fact, Plaintiffs' entire analysis of confusion is captured in a single paragraph:

> In this case, the BUTTERMILK SKY Marks and BUTTERMILK SKY Trade Dress are strong because they are inherently distinctive. Defendants are using identical marks and trade dress for identical services offered in identical retail outlets to identical consumers and using identical advertising media. There can be no reasonable dispute that Defendants' intent is to imitate and suggest an affiliation between themselves and duly licensed users of the BUTTERMILK SKY Marks and BUTTERMILK SKY Trade Dress. The degree of care exercised by potential purchasers is low because the items sold are relatively inexpensive (less than $30). The digits of confusion weigh heavily in favor of a finding of infringement

(Dkt. #4). While the Court believes that Plaintiffs may *eventually* be able to present evidence to establish some confusion caused by Defendants' past use of Buttermilk Trademarks or Buttermilk Trade Dress, right now, Plaintiffs just make conclusory allegations with no case law or evidence

to substantiate their claims.[4] Nor did Plaintiffs provide evidence of a likelihood of confusion when given the chance to do so at the July 29 hearing.[5]

Accordingly, Plaintiffs have failed to carry their burden of showing that there is a likelihood of confusion. Since Plaintiffs have not established any likelihood of confusion—the second element of their trademark and trade dress infringement claims—Plaintiffs have not shown a likelihood of success on the merits on either claim at this stage. So, injunctive relief on either claim is unavailable.[6]

ii. **Plaintiffs' Trade Secret Misappropriation Claims**

Plaintiffs also bring claims for Defendants' alleged violation of the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA") (Dkt. #1 at pp. 16–17). In Plaintiffs' less-than-one-page analysis of both the DTSA and TUTSA, Plaintiffs argue that they will likely prevail on their trade secret misappropriation claims, warranting injunctive relief

---

[4] In their reply brief, Plaintiffs purport to provide evidence of confusion. The evidence provided by Plaintiffs' is: (1) a sign, which was removed over two months prior to their briefing; and (2) the pie recipes, which are part of the trade secret misappropriation claim and not the trademark analysis. As such, the Court does not view this as evidence that there is a likelihood of confusion for the purposes of this injunction. The burden is on Plaintiffs to provide evidence to the Court that they are likely to succeed in showing there is a likelihood of confusion—Plaintiffs failed to provide such evidence. "It is not the obligation of the Court to make arguments on [Plaintiffs'] behalf, and find legal precedent to support those arguments, especially in light of the fact that [Plaintiffs] had ample time to brief the Court." *See Mendoza v. A&A Landscape & Irrigation, LP*, No. 4:12-CV-562, 2013 WL 12403556, at *2 (E.D. Tex. Nov. 26, 2013).

[5] As an exemplar, Plaintiffs attempted to provide testimony at the hearing from Mr. Layton to show that potential customers expressed actual confusion via email. Defendant objected to hearsay, and the Court sustained the objection—Plaintiffs did not try to admit the emails, and so no evidence of actual confusion was ever admitted.

[6] Defendants also argue that Defendants have a license to use Buttermilk Trademarks in perpetuity. Whether there *was* a license is not disputed; rather, the parties disagree as to what type of license was granted. Plaintiffs argue they had the right to terminate the license at any time. Defendants counter the license granted to them could not be terminated at will. The Court need not address these arguments, however.

If Defendants are correct, and their license could not be terminated by Plaintiffs, then Plaintiffs could not show a likelihood of success on the merits. And if Plaintiffs are correct, and Plaintiffs had the right to terminate the license at any time, then Plaintiffs are exactly where they are now—unable to show a likelihood of success on the merits, i.e., that Defendants' infringement of Plaintiffs' trademarks and trade dress is causing a likelihood of confusion. Not to mention, Plaintiffs' correctness on this point would not affect the Court's analysis with regard to the other three preliminary-injunction factors—all which counsel against issuing an injunction. *See supra* Sections I.B–I.D.

(Dkt. #4). Unfortunately, Plaintiffs have not presented evidence that would allow the Court to come to that conclusion.

Plaintiffs assert that the recipes used in making the Buttermilk Sky pies were trade secrets under both the DTSA and the TUTSA, that Defendants obtained those recipes while licensed to use them, and that Defendants continue to use those recipes despite losing their license (Dkt. #4). But even assuming Plaintiffs correctly identify their recipes as trade secrets, Plaintiffs have failed to provide any evidence of trade secret misappropriation—all Plaintiffs' evidence shows is that Defendants' pies *look* similar to Plaintiffs' pies.

Plaintiffs established that the pies at Batch Bakery are decorated in a similar manner to the pies at Buttermilk Sky Pie Shop—but Plaintiffs do not argue that their pie design is a trade secret. The *only* other evidence Plaintiffs presented is that Batch Bakery's pies contain some of the same ingredients as the Buttermilk Sky pies.[7] Plaintiffs failed to establish that the Batch Bakery Pies used—or even had in their possession—the same recipes as Buttermilk Sky Pie Shop. In fact, Plaintiffs' cross-examination of Rachel Dymond—the new owner of Batch Bakery, which was formerly the Allen location of Buttermilk Sky Pie Shop—proved the opposite. Dymond testified that Batch Bakery's apple pie uses a different brand of pre-cooked apples, a technique absent from Buttermilk Sky's recipes. Dymond also testified that Batch Bakery uses a different type of flour in its pie crust than Buttermilk Sky did. Dymond further said that Batch Bakery shredded Buttermilk Sky's recipes and created their own from scratch. Plaintiffs provide no explanation as to how they are likely to succeed on their trade secret misappropriation claims with this evidentiary record.

---

[7] This alone is unremarkable. Indeed, an apple pie contains Granny Smith apples; most pies use flour in their crust; many pies (and baked goods in general) use Mexican vanilla extract. Yet Defendants' continued use of these ingredients was Plaintiffs' only evidence of trade secret misappropriation.

Accordingly, the Court finds that Plaintiffs have not shown there is a likelihood Plaintiffs will succeed on their trade secret misappropriation claim.[8]

### B. Plaintiffs Have Not Shown They Will Suffer Irreparable Harm

Next, Plaintiffs have not shown that they will suffer irreparable harm if the preliminary injunction were denied. A harm is irreparable where there is no adequate remedy at law. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303 (5th Cir. 2008). Generally, this occurs when the harm cannot be undone through monetary damages. *Id.* "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Fletcher's*, 434 F. Supp. 3d at 496 (internal citations removed).

Plaintiffs argue that they are currently suffering irreparable harm because Defendants are actively: (1) infringing on their trademarks and trade dress; and (2) misappropriating their trade secrets. The Court is not so convinced. At best, Plaintiffs' evidence establishes that any infringing activity stopped around the Spring of 2020. Indeed, Defendants' evidence establishes that any infringement likely ceased around the middle of May. And as the Court discussed above, see *supra* I.A.ii, any evidence of ongoing trade secret misappropriation was completely absent.

Plaintiffs have not presented evidence showing that they have experienced a loss of control of reputation, a loss of goodwill, or a loss of trade. And Plaintiffs have pointed to nothing that would indicate they currently are suffering an irreparable injury or would continue to suffer from irreparable harm without injunctive relief. The Court will not issue a preliminary injunction when the only evidence presented shows that any harm done to Plaintiffs has likely ended—past injury

---

[8] The Court need not decide today whether "use" is a required element of a trade secret misappropriation claim brought—not under the common law—but under the DTSA or the TUTSA. *See StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 339–45 (E.D. Tex. 2019) (examining the competing approaches and assuming without deciding that "use" was an essential element of the plaintiffs' trade secret misappropriation claims). Not only do Plaintiffs actually *argue* use ("[Defendants] are now using the BUTTERMILK SKY System without authorization"), but Plaintiffs did not advance the argument that "use" is not a required element under the DTSA or the TUTSA (Dkt. #4). The Court will not make Plaintiffs' argument for them.

is usually compensable through monetary damages. *C.f. Miller v. Harrison County*, 1:07CV541-LG-JMR, 2008 WL 11435639, at *8 (S.D. Miss. Nov. 20, 2008) (citing *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847–48 (5th Cir. 2004)) ("The Court finds that his past injuries and loss, if proven, are capable of being remedied by damages."). Thus, the Court finds that Plaintiffs have not shown a threat of continuing irreparable harm if Defendants are not enjoined.

Indeed, the Court finds that Defendants presented evidence that their rebranding processes likely remedied any harm. Defendants presented photos of the shops before and after the rebranding:

Buttermilk Sky                    Batch Bakery

          

18

 

 

 

(Defense Exhibits 1, 2, 9). The Court agrees that these photos indicate Defendants are no longer using Buttermilk Trademarks or Buttermilk Trade Dress, dooming Plaintiffs' claim that they will suffer irreparable harm without an injunction.

### C. Balance of Hardships

The Court finds that the balance of equities is neutral. The Court already found that Plaintiffs are not currently suffering irreparable harm. *See supra* Section I.B. As for the hardship on Defendants were the Court inclined to issue an injunction, the evidence shows that Defendants already rebranded their stores; so, Defendants already incurred the cost of compliance. As such, there is little to no harm that would be felt by either party here. Thus, this factor is neutral, and Plaintiffs have not carried their burden on this element.

19

### D. An Injunction Will Not Serve the Public Interest

Finally, Plaintiffs must show that granting this injunction would not disserve the public interest. While "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks,"[9] Plaintiffs have not shown that any ongoing infringement or misappropriation is likely. So at best, this factor is neutral, meaning that Plaintiffs have not carried their burden on this element.

### CONCLUSION

Plaintiffs have not shown that any of the four preliminary-injunction factors weigh in favor of injunctive relief. It is therefore **ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. #4) is hereby **DENIED**.

**SIGNED this 12th day of August, 2020.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[9] *Scrum*, 2020 WL 4016110 at *17 (quoting *T-Mobile US, Inc. v. AIO Witeless LLC*, 991 F. Supp. 2d 88, 928 (S.D. Tex. 2014) (Rosenthal, J.) (internal citations removed)).